**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------

| | |
|---|---|
| RYAN O'DELL, | : |
| | : |
| Plaintiff, | : Civil Action No. 1:22-cv-02139 |
| | : |
| v. | : **COMPLAINT FOR VIOLATIONS OF** |
| | : **SECTIONS 14(a) AND 20(a) OF THE** |
| ZYNGA INC., MARK PINCUS, FRANK | : **SECURITIES EXCHANGE ACT OF** |
| GIBEAU, REGINA E. DUGAN, WILLIAM | : **1934** |
| "BING" GORDON, LOUIS J. LAVIGNE JR., | : |
| CAROL G. MILLS, JANICE M. ROBERTS, | : **JURY TRIAL DEMANDED** |
| ELLEN F. SIMINOFF, NOEL WATSON, | : |
| TAKE-TWO INTERACTIVE SOFTWARE, | : |
| INC., ZEBRA MS I, INC., and ZEBRA MS II, | : |
| INC., | : |
| | : |
| Defendants. | : |

--------------------------------------------------------- :

Ryan O'Dell ("Plaintiff"), by and through his attorneys, alleges the following upon information and belief, including investigation of counsel and review of publicly-available information, except as to those allegations pertaining to Plaintiff, which are alleged upon personal knowledge:

1. This is an action brought by Plaintiff against Zynga Inc., ("Zynga" or the "Company"), the members of Zynga's board of directors, and Take-Two Interactive Software, Inc. and its affiliates ("Take-Two" and, collectively with the Company, the "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a), and SEC Rule 14a-9, 17 C.F.R. 240.14a-9 and 17 C.F.R. § 244.100, in connection with the proposed merger between Zynga and Take-Two.

2. Defendants have violated the above-referenced sections of the Exchange Act by causing a materially incomplete and misleading Registration Statement on Form S-4 (the

"Registration Statement") to be filed on March 11, 2022 with the United States Securities and Exchange Commission ("SEC") and disseminated to Company stockholders.  The Registration Statement recommends that Company stockholders vote in favor of a proposed transaction whereby Zebra MS I, Inc., a direct and wholly owned subsidiary of Take-Two ("Merger Sub 1"), will merge with and into Zynga, with Zynga surviving as a wholly owned subsidiary of Take-Two; and immediately after, Zynga will merge with and into Zebra MS II, Inc., a direct wholly owned subsidiary of Take-Two ("Merger Sub 2"), with Merger Sub 2 continuing as the surviving corporation (the "Proposed Transaction").  Pursuant to the terms of the definitive agreement and plan of merger the companies entered into dated January 9, 2022 (the "Merger Agreement"), each Zynga stockholder will receive (i) $3.50 in cash; and (ii) approximately $6.36 shares of Take-Two common stock, based on a Take-Two share price of $169.19 as the midpoint within a 7.5% symmetrical collar (the "Merger Consideration").  Following the consummation of the Proposed Transaction, Company shareholders will own between 29.6% and 32.8% of the combined company and Take-Two shareholders will own between 67.2% and 70.4% of the combined company.

3.       As discussed below, Defendants have asked Zynga's stockholders to support the Proposed Transaction based upon the materially incomplete and misleading representations and information contained in the Registration Statement, in violation of Sections 14(a) and 20(a) of the Exchange Act.  Specifically, the Registration Statement contains materially incomplete and misleading information concerning the analyses performed by the Company's financial advisor, Goldman Sachs & Co. LLC ("Goldman Sachs") in support of its fairness opinion.

4.      It is imperative that the material information that has been omitted from the Registration Statement is disclosed to the Company's stockholders prior to the forthcoming stockholder vote so that they can properly exercise their corporate suffrage rights.

5.      For these reasons and as set forth in detail herein, Plaintiff seeks to enjoin Defendants from taking any steps to consummate the Proposed Transaction unless and until the material information discussed below is disclosed to Zynga's stockholders or, in the event the Proposed Transaction is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Sections 14(a) and 20(a) of the Exchange Act and SEC Rule 14a-9.

7.      Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

8.      Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because Take-Two, Merger Sub 1, and Merger Sub 2 reside in this District.

## PARTIES

9.      Plaintiff is, and has been at all relevant times, an owner of Zynga stock and has held such stock since prior to the wrongs complained of herein.

10.     Individual Defendant Mark Pincus has served as a member of the Board since 2007 and is the Chairman of the Board and founder of the Company.

11.     Individual Defendant Frank Gibeau has served as a member of the Board since 2015 and is the Chief Executive Officer of the Company.

12.     Individual Defendant Regina E. Dugan has served as a member of the Board since 2014.

13.     Individual Defendant William "Bing" Gordon has served as a member of the Board since 2008.

14.     Individual Defendant Louis J. Lavigne, Jr. has served as a member of the Board since March 2017.

15.     Individual Defendant Carol G. Mills has served as a member of the Board since April 2015.

16.     Individual Defendant Janice M. Roberts has served as a member of the Board since September 2015.

17.     Individual Defendant Ellen F. Siminoff has served as a member of the Board since June 2021.

18.     Individual Defendant Noel Watson has served as a member of the Board since June 2021.

19.     Defendant Zynga is a Delaware corporation and maintains its principal offices at 699 8th Street, San Francisco, California 94103.  The Company's stock trades on the NASDAQ Global Select Market under the symbol "ZNGA."

20.     Defendant Take-Two is a Delaware corporation and maintains its principal offices at 110 West 44th Street, New York, New York 10036.  Take-Two's stock trades on the NASDAQ Global Select Market under the symbol "TTWO."

21.     Defendant Merger Sub 1 is a Delaware corporation and a direct wholly owned subsidiary of Take-Two.

22.     Defendant Merger Sub 2 is a Delaware corporation and a direct wholly owned subsidiary of Take-Two.

23.     The defendants identified in paragraphs 10-18 are collectively referred to as the "Individual Defendants" or the "Board."

24.     The defendants identified in paragraphs 10-22 are collectively referred to as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

### A.     The Proposed Transaction

25.     Zynga provides social game services in the United States and internationally.  The Company develops, markets, and operates social games as live services played on mobile platforms, such as Apple iOS and Google's Android operating systems; social networking platforms, such as Facebook and Snapchat; and personal computer consoles, such as Nintendo's Switch game console, and other platforms and consoles.  It also licenses its own brands and provides advertising services comprising mobile advertisements, engagement advertisements and offers, and branded virtual items and sponsorships for marketers and advertisers.  The Company was formerly known as Zynga Game Network Inc. and changed its name to Zynga Inc. in November 2010.  Zynga was founded in 2007 and is headquartered in San Francisco, California.

26.     On January 10, 2022, the Company and Take-Two jointly announced the Proposed Transaction:

NEW YORK & SAN FRANCISCO--(BUSINESS WIRE)--Take-Two Interactive (NASDAQ: TTWO) (the "Company") and Zynga (NASDAQ: ZNGA), two leaders in interactive and mobile entertainment, today announced that they have entered into a definitive agreement, under which Take-Two will acquire all of the outstanding shares of Zynga in a cash and stock transaction valued at $9.86[1] per Zynga share, based on the market close as of January 7, 2022, with a total enterprise value of approximately $12.7 billion. Under the terms and subject to the conditions of the agreement, Zynga stockholders will receive $3.50 in cash and $6.36[1] in shares of Take-Two common stock for each share of Zynga common stock outstanding at the closing of the transaction. The purchase price represents a premium of 64% to Zynga's closing share price on January 7, 2022.

This transformative combination unifies two global leaders in the interactive entertainment business and establishes Take-Two as one of the largest and most diversified mobile game publishers in the industry, with $6.1 billion in pro-forma Net Bookings for the trailing twelve-month period ended September 30, 2021.

Both companies have created and expanded iconic franchises, which will combine to form one of the largest and most diverse portfolios of intellectual properties in the sector. Take-Two's labels are home to some of the most beloved series in the world, including *Grand Theft Auto®, Red Dead Redemption®, Midnight Club®, NBA 2K®, BioShock®, Borderlands®, Civilization®, Mafia®,* and *Kerbal Space Program®,* while Zynga's portfolio includes renowned titles, such as *CSR Racing™, Empires & Puzzles™, FarmVille™, Golf Rival™, Hair Challenge™, Harry Potter: Puzzles & Spells™, High Heels!™, Merge Dragons!™, Toon Blast™, Toy Blast™, Words With Friends™,* and *Zynga Poker™.*

## Management Comments

"We are thrilled to announce our transformative transaction with Zynga, which significantly diversifies our business and establishes our leadership position in mobile, the fastest growing segment of the interactive entertainment industry," said Strauss Zelnick, Chairman and CEO of Take-Two. "This strategic combination brings together our best-in-class console and PC franchises, with a market-leading, diversified mobile publishing platform that has a rich history of innovation and creativity. Zynga also has a highly talented and deeply experienced team, and we look forward to welcoming them into the Take-Two family in the coming months. As we combine our

complementary businesses and operate at a much larger scale, we believe that we will deliver significant value to both sets of stockholders, including $100 million of annual cost synergies within the first two years post-closing and at least $500 million of annual Net Bookings opportunities over time."

"Combining Zynga's expertise in mobile and next-generation platforms with Take-Two's best-in-class capabilities and intellectual property will enable us to further advance our mission to connect the world through games while achieving significant growth and synergies together," said Frank Gibeau, CEO of Zynga. "I am proud of our team's hard work to deliver a strong finish to 2021, with one of the best performances in Zynga's history. We are incredibly excited to have found a partner in Take-Two that shares our commitment to investing in our players, amplifying our creative culture, and generating more value for stockholders. With this transformative transaction, we begin a new journey which will allow us to create even better games, reach larger audiences and achieve significant growth as a leader in the next era of gaming."

## Strategic Rationale and Stockholder Value Creation

With Zynga's stockholders receiving approximately 64.5%[1] of the transaction consideration in Take-Two stock, both groups of stockholders will benefit from the combined company's greater scale, enhanced financial profile, and the synergies created through the transaction.

**Combined company is well-positioned to capitalize on the interactive entertainment industry's strong tailwinds, including a leadership position in mobile.** The video game sector has experienced rapid growth over the last few years and is now the largest vertical in the entertainment industry[2]. Mobile gaming is the fastest growing segment within the industry, with an estimated $136 billion[2] in gross bookings in 2021, and an expected compound annual growth rate of 8%[2] over the next three years. The transaction is expected to establish Take-Two as a leader in mobile gaming, with mobile expected to comprise over 50% of its Net Bookings in Fiscal Year 2023 (as compared to an estimated 12% in Fiscal Year 2022). The transaction will bolster Take-Two's mobile offerings, which include popular games such as *Dragon City, Monster Legends, Top Eleven*, *Two Dots,* and *WWE SuperCard*, and consist of a diverse array of titles that focus on many of the most popular genres in mobile gaming, including casual, hyper-casual, lifestyle, mid-core, puzzle, social casino and sports games.

**Formation of an industry-leading portfolio, comprising Take-Two's best-in-class intellectual properties and Zynga's renowned mobile titles.** The transaction will create a powerful and diverse portfolio of industry-leading titles that span key platforms and genres across interactive entertainment, developed by some of the most creative and forward-thinking talent within the industry. By sharing best practices and key data insights across the enterprise, the Company is expected to benefit from significant development and publishing synergies, unlock new revenue streams and reach new audiences around the world.

**The combined entity has significantly greater scale,** with $6.1 billion in Net Bookings, and $769 million[3] in Adjusted Unrestricted Operating Cash Flow on a pro-forma basis for the trailing twelve-month period ended September 30, 2021. Looking ahead, the combined company is expected to deliver a 14%[4] compound annual growth rate for Net Bookings (excluding the annual Net Bookings opportunities and any future acquisitions) over the three-year period from Take-Two's Fiscal Years 2021 through 2024.

**Addition of Zynga's mobile titles will expand the Company's base of Recurrent Consumer Spending ("RCS").** Through the addition of Zynga's mobile business, particularly its diversified portfolio of live services and upcoming pipeline of new releases, Take-Two will increase its sources of RCS, a highly-attractive revenue stream that helps reduce volatility across reporting periods that has historically been driven by the cadence of Take-Two's console and PC release slate.

**Take-Two has also identified over $500 million of incremental annual Net Bookings opportunities to unlock over time, driven by:**

**Creation of new mobile games for many of the iconic franchises within Take-Two's portfolio of intellectual property.** Take-Two has an extensive catalog of commercially and critically successful console and PC titles with engaged and loyal communities of players, and there is a meaningful opportunity to create mobile games and new cross-platform experiences for many of these properties. Zynga's nearly 3,000 employees include highly-talented mobile developers, paving the way for Take-Two to accelerate this strategic initiative and introduce its iconic intellectual properties across the fastest-growing platform in the industry.

**Ability to optimize RCS by leveraging the collective knowledge across both companies.** Both Take-Two and Zynga have extensive capabilities to engage players through live operations ("LiveOps") and RCS initiatives. By combining resources and proven acumen, the teams at Take-Two and Zynga will deploy best-in-class practices throughout the organization to enhance and grow existing titles across the portfolio. Key opportunities include cross-marketing through a larger, shared customer database and improving game economies through more effective data analytics and machine learning models.

**Other strategic benefits** include the use of Zynga's Chartboost advertising platform, which will improve new user acquisition through better audience targeting and optimize mobile advertising inventory to achieve greater yields; geographic expansion into growth markets across Asia, including India, and the Middle East, among other regions; and an enhanced focus on technological innovation and new business models that will utilize the collective knowledge of forward-thinking talent.

**Take-Two expects approximately $100 million of annual cost synergies** within the first two years after closing, primarily driven by the rationalization of duplicative overhead including corporate general and administrative expenses and public company costs, as well as the benefit of scale efficiencies across the enterprise.

**The acquisition is structured to maintain a strong balance sheet**, including significant annual cash generation. The combined company's strategic and financial flexibility is expected to be greater than each company on a standalone basis, providing Take-Two with the financial resources to continue to invest in talent, development, and innovation, while also pursuing select inorganic growth opportunities.

<u>**Leadership**</u>

At the close of the transaction, Strauss Zelnick will continue to serve as Chairman and CEO, and the management team of Take-Two will continue to lead the combined company. Zynga's highly skilled and proven management team, led by Frank Gibeau and Zynga's President of Publishing, Bernard Kim, will drive the strategic direction for Take-Two's mobile efforts and will oversee the integration, and day-to-day operations of the combined Zynga and T2 Mobile Games business, which will operate under the Zynga brand as its own label within the Company. Additionally, Take-Two

will expand its Board of Directors to 10 members upon the closing of the transaction to add two members from Zynga's Board of Directors.

### Terms of the Acquisition

Zynga stockholders will receive $3.50 in cash and $6.36[1] in shares of Take-Two common stock for each share of Zynga common stock outstanding at the closing. The transaction is valued at $9.86[1] per share of Zynga common stock based on the market closing as of January 7, 2022, implying an enterprise value of approximately $12.7 billion.

The transaction includes a collar mechanism on the equity consideration, so that if Take-Two's 20-day volume weighted average price ("VWAP") ending on the third trading day prior to closing is in a range from $156.50 to $181.88, the exchange ratio would be adjusted to deliver total consideration value of $9.86 per Zynga share (including $6.36 of equity value based on that VWAP and $3.50 in cash). If the VWAP exceeds the higher end of that range, the exchange ratio would be 0.0350 per share, and if the VWAP falls below the lower end of that range, the exchange ratio would be 0.0406 per share.

Within the collar range, the final number of Take-Two shares estimated to be issued on a fully diluted basis will range between approximately 50.3 million and 58.5 million shares. Upon closing of the transaction, current Take-Two stockholders will own between 67.2% and 70.4% and current Zynga stockholders are expected to own between 29.6% and 32.8% of the combined company on a fully diluted basis, respectively, including the shares associated with expected settlement of Zynga's two outstanding series of convertible notes due 2024 and 2026.

As part of the transaction, Take-Two has received committed financing of $2.7 billion from J.P. Morgan and intends to fund the cash component of the transaction through a combination of cash from its balance sheet as well as proceeds of new debt issuance.

The merger agreement provides for a "go-shop" provision under which Zynga and its Board of Directors may actively solicit, receive, evaluate, and potentially enter negotiations with parties that offer alternative proposals during a 45-day period following the execution date of the definitive agreement, expiring on February 24, 2022. There can be no assurance this process will result in a superior

proposal. Zynga does not intend to disclose developments about this process unless and until its Board of Directors has made a decision with respect to any potential superior proposal.

[1] *Within a 7.5% symmetrical collar based on a Take-Two share price of $169.19 as the midpoint.*
[2] *Source: IDG Consulting.*
[3] *Based on the trailing twelve-month period ended September 30, 2021. Combines Take-Two's Adjusted Unrestricted Operating Cash Flow of $467 million and Zynga's Operating Cash Flow of $302 million.*
[4] *Due to different fiscal year ends, appropriate modifications were made to calculate information based on Take-Two's fiscal year end.*

## Approvals and Close Timing

The transaction, which is expected to be completed during the first quarter of Take-Two's Fiscal Year 2023, ending June 30, 2022, is subject to the approval of both Take-Two and Zynga stockholders and the satisfaction of customary closing conditions, including applicable regulatory approvals.

The transaction has been unanimously approved by the Take-Two and Zynga Boards of Directors. Moreover, each director and executive officer of Take-Two and Zynga have entered into voting agreements to support the transaction.

## Advisors

J.P. Morgan and LionTree Advisors are serving as financial advisors to Take-Two and Willkie Farr & Gallagher LLP is serving as legal counsel. Goldman Sachs & Co. LLC is acting as financial advisor to Zynga and Wilson Sonsini Goodrich & Rosati, Professional Corporation is serving as legal counsel.

\* \* \*

27.     The Board has unanimously agreed to the Proposed Transaction.  It is therefore imperative that Zynga's stockholders are provided with the material information that has been

omitted from the Registration Statement, so that they can meaningfully assess whether or not the Proposed Transaction is in their best interests prior to the forthcoming stockholder vote.

**B.**     **The Materially Incomplete and Misleading Registration Statement**

28.     On March 11, 2022, Zynga and Take-Two jointly filed the Registration Statement with the SEC in connection with the Proposed Transaction.  The Registration Statement was furnished to the Company's stockholders and solicits the stockholders to vote in favor of the Proposed Transaction.  The Individual Defendants were obligated to carefully review the Registration Statement before it was filed with the SEC and disseminated to the Company's stockholders to ensure that it did not contain any material misrepresentations or omissions. However, the Registration Statement misrepresents and/or omits material information that is necessary for the Company's stockholders to make an informed decision concerning whether to vote in favor of the Proposed Transaction, in violation of Sections 14(a) and 20(a) of the Exchange Act.

*Omissions and/or Material Misrepresentations Concerning Financial Projections*

29.     The Registration Statement fails to provide material information concerning financial projections by management and relied upon by Goldman Sachs in its analyses.  The Registration Statement discloses management-prepared financial projections for the Company which are materially misleading.  The Registration Statement indicates that in connection with the rendering of its fairness opinion, the Company's management and Take-Two's management prepared certain non-public financial forecasts (the "Projections") and provided them to the Board and Goldman Sachs with the purpose of forming a view about the stand-alone valuation. Accordingly, the Registration Statement should have, but fails to provide, certain information in the projections that the companies provided to the Board and Goldman Sachs.  Courts have uniformly stated that "projections … are probably among the most highly-prized disclosures by

investors. Investors can come up with their own estimates of discount rates or [] market multiples. What they cannot hope to do is replicate management's inside view of the company's prospects." *In re Netsmart Techs., Inc. S'holders Litig.*, 924 A.2d 171, 201-03 (Del. Ch. 2007).

30.     For the Take-Two Projections, the Registration Statement provides values for non-GAAP (Generally Accepted Accounting Principles) financial metrics for fiscal years 2022 through 2025: Adjusted Net Income, Adjusted EBITDA, Adjusted Unrestricted Operating Cash Flow, and Unlevered Free Cash Flows, but fails to provide line items used to calculate these metrics or a reconciliation of these non-GAAP metrics to their most comparable GAAP measures, in direct violation of Regulation G and consequently Section 14(a).

31.     For the Synergy Projections, the Registration Statement provides values for non-GAAP (Generally Accepted Accounting Principles) financial metrics for fiscal years 2023 through 2027: Operating Contribution from Net Bookings Opportunities, but fails to provide line items used to calculate this metric or a reconciliation of this non-GAAP metric to its most comparable GAAP measure, in direct violation of Regulation G and consequently Section 14(a).

32.     For the Company Projections – Standalone, the Registration Statement provides values for non-GAAP financial metrics for fiscal years 2021 through 2024: Bookings and Adjusted EBITDA, but fails to provide line items used to calculate these metrics or a reconciliation of these non-GAAP metrics to their most comparable GAAP measures, in direct violation of Regulation G and consequently Section 14(a).

33.      For the Company Projections – Standalone, updated as of December 29, 2021, the Registration Statement provides values for non-GAAP financial metrics for fiscal years 2021 through 2024: Bookings Adjusted EBITDA, and Unlevered Free Cash Flow, but fails to provide line items used to calculate these metrics or a reconciliation of these non-GAAP metrics to their

most comparable GAAP measures, in direct violation of Regulation G and consequently Section 14(a).

34.     For the Combined Company Projections, the Registration Statement provides values for non-GAAP financial metrics for fiscal years 2023 through 2027: Bookings, Adjusted EBITDA, and Unlevered Free Cash Flow, but fails to provide line items used to calculate these metrics or a reconciliation of these non-GAAP metrics to their most comparable GAAP measures, in direct violation of Regulation G and consequently Section 14(a).

35.     When a company discloses non-GAAP financial measures in a Registration Statement that were relied on by a board of directors to recommend that stockholders exercise their corporate suffrage rights in a particular manner, the company must, pursuant to SEC regulatory mandates, also disclose all projections and information necessary to make the non-GAAP measures not misleading, and must provide a reconciliation (by schedule or other clearly understandable method) of the differences between the non-GAAP financial measure disclosed or released with the most comparable financial measure or measures calculated and presented in accordance with GAAP.  17 C.F.R. § 244.100.

36.     The SEC has noted that:

> companies should be aware that this measure does not have a uniform definition and its title does not describe how it is calculated. Accordingly, a clear description of how this measure is calculated, as well as the necessary reconciliation, should accompany the measure where it is used. Companies should also avoid inappropriate or potentially misleading inferences about its usefulness. For example, "free cash flow" should not be used in a manner that inappropriately implies that the measure represents the residual cash flow available for discretionary expenditures, since many companies have mandatory debt service requirements or other non-discretionary expenditures that are not deducted from the measure.

37.     Thus, to cure the Registration Statement and the materially misleading nature of the forecasts under SEC Rule 14a-9 as a result of the omitted information in the Registration Statement, Defendants must provide a reconciliation table of the non-GAAP measures to the most comparable GAAP measures to make the non-GAAP metrics included in the Registration Statement not misleading.

*Omissions and/or Material Misrepresentations Concerning Financial Analyses for Zynga*

38.     With respect to Goldman Sachs' *Illustrative Present Value of Future Stock Price Analysis – Zynga Standalone*, the Registration Statement fails to disclose: (i) the inputs and assumptions underlying the use of forward EV/EBITDA multiples of 10.0x to 15.0x to the EBITDA estimates of Zynga; (ii) Zynga's estimated net debt as of December 31, 2023 and 2024; (iii) the estimated number of projected fully diluted shares outstanding as of December 31, 2023 and 2024; (iv) the inputs and assumptions underlying the use of the discount rate of 7.0%; and (v) Zynga's cost of equity.

39.     With respect to Goldman Sachs' *Illustrative Pro Forma Present Value of Future Stock Price Analysis – Combined Company*, the Registration Statement fails to disclose: (i) the inputs and assumptions underlying the use of forward EV/EBITDA multiples of 15.0x to 20.0x to the EBITDA estimates of the combined company; (ii) the combined company's estimated net debt as of March 31, 2023 and 2024; (iii) the estimated number of projected fully diluted shares outstanding as of March 31, 2023 and 2024; (iv) the inputs and assumptions underlying the use of the discount rate of 6.0%; and (v) the pro forma combined company's cost of equity.

40.     With respect to Goldman Sachs' *Illustrative Discounted Cash Flow Analysis – Zynga Standalone*, the Registration Statement fails to disclose: (i) the range of illustrative terminal values of the Company; (ii) line items used to calculate Zynga's projected unlevered free cash

flows; (iii) the inputs and assumptions underlying the use of the illustrative perpetuity growth rate of 1.50% to 2.50%; (iv) the inputs and assumptions underlying the discount rates ranging from 6.0% to 8.0%; (v) the Company's weighted average cost of capital; (vi) the net debt of the Company as of September 30, 2021; and (vii) the number of fully diluted outstanding shares of Zynga.

41.     With respect to Goldman Sachs' *Illustrative Discounted Cash Flow Analysis – Combined Company*, the Registration Statement fails to disclose: (i) the range of illustrative terminal values of the combined company; (ii) line items used to calculate Take-Two pro forma projected unlevered free cash flows; (iii) the inputs and assumptions underlying the use of the illustrative perpetuity growth rate of 1.50% to 2.50%; (iv) the inputs and assumptions underlying the discount rates ranging from 5.0% to 7.0%; (v) the combined company's weighted average cost of capital; (vi) the pro forma estimated net debt of the combined company; and (vii) the estimated number of outstanding shares of common stock of the combined company.

42.     With respect to Goldman Sachs' *Selected Precedent Transactions Analysis*, the Registration Statement fails to disclose the financial metrics of each transaction selected by Goldman Sachs for the analysis.

43.     With respect to Goldman Sachs' *Premia Analysis*, the Registration Statement fails to disclose the transactions observed and the premia of those transactions.

44.     In sum, the omission of the above-referenced information renders statements in the Registration Statement materially incomplete and misleading in contravention of the Exchange Act.  Absent disclosure of the foregoing material information prior to the special stockholder meeting to vote on the Proposed Transaction, Plaintiff will be unable to make a fully-informed

decision regarding whether to vote in favor of the Proposed Transaction, and he is thus threatened with irreparable harm, warranting the injunctive relief sought herein.

### CLAIMS FOR RELIEF

### COUNT I

**On Behalf of Plaintiff Against All Defendants for Violations of
Section 14(a) of the Exchange Act and Rule 14a-9 and 17 C.F.R. § 244.100**

45.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

46.     Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that proxy communications with stockholders shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. § 240.14a-9.

47.     Defendants have issued the Registration Statement with the intention of soliciting stockholder support for the Proposed Transaction.  Each of the Defendants reviewed and authorized the dissemination of the Registration Statement and the use of their name in the Registration Statement, which fails to provide critical information regarding, among other things, the financial projections that were prepared by the Company and relied upon by the Board in recommending the Company's stockholders vote in favor of the Proposed Transaction.

48.     In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading.  Each of the Individual Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a).  The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were

misstated or omitted from the Registration Statement, but nonetheless failed to obtain and disclose such information to stockholders, although they could have done so without extraordinary effort.

49.     Defendants were, at the very least, negligent in preparing and reviewing the Registration Statement.   The preparation of a Registration Statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence.   Defendants were negligent in choosing to omit material information from the Registration Statement or failing to notice the material omissions in the Registration Statement upon reviewing it, which they were required to do carefully.   Indeed, Defendants were intimately involved in the process leading up to the signing of the Merger Agreement and the preparation and review of strategic alternatives.

50.     The misrepresentations and omissions in the Registration Statement are material to Plaintiff, who will be deprived of his right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Transaction.   Plaintiff has no adequate remedy at law.   Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II

**On Behalf of Plaintiff Against the Individual Defendants
for Violations of Section 20(a) of the Exchange Act**

51.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

52.     The Individual Defendants acted as controlling persons of Zynga within the meaning of Section 20(a) of the Exchange Act as alleged herein.   By virtue of their positions as directors of Zynga, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Registration

Statement filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision-making of Zynga, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

53.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Registration Statement and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

54.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of Zynga, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same.  The omitted information identified above was reviewed by the Board prior to voting on the Proposed Transaction.  The Registration Statement at issue contains the unanimous recommendation of the Board to approve the Proposed Transaction.  The Individual Defendants were thus directly involved in the making of the Registration Statement.

55.     In addition, as the Registration Statement sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement.  The Registration Statement purports to describe the various issues and information that the Individual Defendants reviewed and considered.  The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

56.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

57.    As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9, by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

58.    Plaintiff has no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## **RELIEF REQUESTED**

WHEREFORE, Plaintiff demands injunctive relief in his favor and against the Defendants jointly and severally, as follows:

A.    Preliminarily and permanently enjoining Defendants and their counsel, agents, employees and all persons acting under, in concert with, or for them, from proceeding with, consummating, or closing the Proposed Transaction, unless and until Defendants disclose the material information identified above which has been omitted from the Registration Statement;

B.    Rescinding, to the extent already implemented, the Merger Agreement or any of the terms thereof, or granting Plaintiff rescissory damages;

C.    Directing the Defendants to account to Plaintiff for all damages suffered as a result of their wrongdoing;

D.    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

E.    Granting such other and further equitable relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: March 15, 2022        **WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP**

               By:   *_/s/ Benjamin Y. Kaufman_____*
                      Benjamin Y. Kaufman
                      270 Madison Avenue
                      New York, NY 10016
                      Telephone: (212) 545-4600
                      Email: kaufman@whafh.com

                      *Attorneys for Plaintiff*